IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KATHLEEN A. ROUNSEVELLE,

          Plaintiff,

                                    Case 3:12-cv-01970-PK

                                    FINDINGS AND

v.                                    RECOMMENDATION

CAROLYN W. COLVIN
Acting Commissioner of Social Security,

          Defendant.
_____

PAPAK, Magistrate Judge:

      Plaintiff Kathleen Adele Rounsevelle filed this action November 2, 2012, seeking judicial

review of the Commissioner of Social Security's decision denying her application for

supplemental security income under Title XVI of the Social Security Act.  This court has

jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g).

Page 1 - FINDINGS AND RECOMMENDATION

Rounsevelle argues that the Commissioner of Social Security ("Commissioner") erroneously declined to open her prior benefits applications, mischaracterized and failed to consider all of her impairments at the second step of the five-step sequential evaluation process, failed adequately to develop the record, developed an incomplete residual functional capacity ("RFC"), and, in consequence, erred in posing questions to the vocational expert.  Furthermore, Rounsevelle argues that the Appeals Council erred by not considering additional evidence she submitted after the Administrative Law Judge ("ALJ") issued his decision.  I have considered all of the parties' briefs and all of the evidence in the administrative record.  For the reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration.  *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ considers the claimant's work activity, if any.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at

140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b).  Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).  Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482. U.S. at 153-154.  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work."  *Id.*, *quoting* SSR 85-28, 1985 WL 56856 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

Page 3 - FINDINGS AND RECOMMENDATION

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's RFC, based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 416.945(a); *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

Page 4 - FINDINGS AND RECOMMENDATION

the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Rounsevelle was born April 16, 1962. (Tr. 114).[2]  She "was raised by her parents in an intact family" (Tr. 312), and graduated from Milwaukie high school in 1980. (Tr. 114, 551). She has a brother and sister who are 15 and 19 years older. (Tr. 312, 551).  According to Rounsevelle's records of wages earned, prior to her claimed disability onset date of September 30, 2001, Rounsevelle worked as a data processing analyst for Priestley Oil & Chemical from 1983-1990 (earning $1,560 per month), an accounts receivable bookkeeper for Empire Rubber & Supply Co. from 1984-1990 (earning $1,300 per month), an assistant manager for Hawkeye Construction from 1991-1992 (earning $1,300 per month), a receptionist and clerk for Rapid Bind, Inc., from 1993-1995 (earning $1,300 per month), a cashier for 7-11 from 1996-1999 and in 2001 (earning $8.00 per hour), a gas station attendant at Space Age Fuel in 2000 (earning $6.00 per hour), a cashier for Plaid Pantries, Inc., in 2000 (earnings not specified), a cashier for Fred Meyer, Inc., in 2000 (earnings not specified), and a receptionist and file clerk for General Tool & Supply Co. at an unspecified date (earning $8.00 per hour).  (Tr. 233-242, 280-281).

In 1988, when Rounsevelle was 26, she married Scott, with whom she had two children. (Tr. 312).  Rounsevelle and Scott divorced in 1991.  (Tr. 312, 552).  At the time of the divorce, Rounsevelle "had been using alcohol, but this increased, and she was not able to care for the children," who were subsequently raised by Scott after he was given full custody of them.  (Tr. 312, 552).

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 10.

Page 6 - FINDINGS AND RECOMMENDATION

After her divorce, Rounsevelle began a "stormy relationship" with Rob (Tr. 312),[3] one in which "drinking and later drug use were an issue." (Tr. 312). Rounsevelle reported that Rob was extremely violent, and would beat, smother, and rape her. (Tr. 402). At least ten police reports were filed from June 1993 to October 1995 in connection with such incidents.[4] (Tr. 550). Sometime in or around 1992, Rounsevelle and Rob had a child together. (Tr. 312). In November 1995, their child, then age three, was taken into custody by the State Office of Services for Children and Families ("SCF") "because of the domestic violence between [his] parents and [Rounsevelle's] persistent reconciliations with the father/abuser." (Tr. 312, 550). Rounsevelle was unable to regain custody of Donovan, who was raised by Rounsevelle's brother. (Tr. 312). Many of the physical and mental impairments referenced in Rounsevelle's supplemental security income ("SSI") application stem from the extensive violent physical abuse that she endured during her relationship with Rob.

Rounsevelle has an extensively documented medical history, primarily concerning carpal tunnel syndrome ("CTS"), degenerative disk disease ("DDD") of the cervical spine, and post traumatic stress disorder ("PTSD") (symptoms of anxiety and depression). The earliest medical report in the record is from 1996, when Rounsevelle underwent two comprehensive

---

[3] While the man is referred to as "Rob" throughout a majority of the record, during Rounsevelle's 1996 comprehensive psychological evaluations by Dr. Ude, the same man is referred to as "Charles Greenland" and "Mr. Greenland." (Tr. 550). It is clear "Rob" and "Charles" are the same man, as both are referenced as the father of Rounsevelle's third child. Without any explanation as to the reason for the multiple names, the man will be referred to as "Rob," as it is the name referenced throughout a majority of the record.

[4] "Police reports indicate slapping, pushing, hair pulling, shoving, holding the victim on the floor and clamping hand over the mouth, strongly enough to cut the mouth, and once kicked hard enough to bruise her heart. . . . There have been threats to kill Ms. Rounsevelle. . . . On a prior occasion . . . [Rounsevelle] was hospitalized with broken ribs and a bruise to her heart." (Tr. 552-553).

Page 7 - FINDINGS AND RECOMMENDATION

psychological evaluations.  The first evaluation was performed over two days, January 29, 1996 and March 25, 1996 (Tr. 550), and the second on October 14, 1996 (Tr. 542), both by clinical psychologist Luahna Ude, Ph.D., to whom Rounsevelle was referred by her State Office of Services for Children and Families caseworker, in connection with her loss of custody of her son Donovan in November 1995.  (Tr. 550).

Following Dr. Ude's 1996 evaluations, the next medical report of record dates from November 30, 2004, more than three years after Rounsevelle's alleged disability onset date of September 30, 2001.

On November 30, 2004, Rounsevelle consulted Dr. Huey Meeker, her primary care physician, to address her complaints of depression and chronic wrist pain.  (Tr. 430-431).  Dr. Meeker reported that Rounsevelle had been dealing with wrist pain for at least four years, but had not followed his treatment recommendations to that point.  (Tr. 430-431).  Dr. Meeker further reported that while Rounsevelle's depression had improved, she suffered from chronic arthritis, and was experiencing neck pain, though not from any specific injury.  (Tr. 430-431).

Dr. Meeker referred Rounsevelle to neurologist Gajanan Nilaver, M.D. (Tr. 430-431, 470), with whom she consulted on December 13, 2004.  (Tr. 533-536).  Dr. Nilaver opined that Rounsevelle was likely suffering DDD of the cervical spine (Tr. 470, 533-536), CTS, and dysesthesia.  (Tr. 533-536).  Dr. Nilaver reported that Rounsevelle might require carpal tunnel decompression surgery, and that an electrodiagnostic examination would help determine the existence and extent of her CTS.  (Tr. 535).

Dr. Nilaver referred Rounsevelle to Kevin Jamison, M.D., at Oregon Neurology for the recommended electrodiagnostic examination.  On January 3, 2005, Dr. Jamison reported that Rounsevelle had moderate to severe right CTS, but "[o]n the left side, the situation [was] not as

Page 8 - FINDINGS AND RECOMMENDATION

clear. She appear[ed] to have an 'ulnar hand' with innervation of the thenar eminence from the ulnar nerve, [which] eliminates the possibility of entrapment at the transverse carpal ligament." (Tr. 537-538). On January 10, 2005, Rounsevelle followed up with Dr. Nilaver, who concurred with the right CTS diagnosis and referred her "for surgical intervention for right [CTS]." (Tr. 532).

On February 16, 2005, Rounsevelle consulted with John Hardiman, M.D., a physician and surgeon who specialized in orthopedic and fracture surgery. (Tr. 531). After examining Rounsevelle and Dr. Jamison's notes and examination results, Dr. Hardiman concurred with the diagnosis of right CTS and concluded that surgery would be appropriate, stating, "I think that we can offer her a surgical approach. We would start with the more clear side, the right side, with a carpal tunnel release." (Tr. 531). At Rounsevelle's March 2, 2005 follow-up appointment, after learning that Rounsevelle's insurance would not cover the right CTS surgery, Dr. Hardiman administered a Depo-Medrol injection to her right wrist to see if she would obtain any benefit from it. (Tr. 531). On March 29, 2005, she received the same injection in her left wrist along with Xylocaine (Tr. 531), and on May 5, 2005, a second injection in her right wrist, again with Xylocaine. (Tr. 531).

On June 7, 2005, Rounsevelle met with Dr. Meeker complaining of left hand pain and swelling. (Tr. 429). At that time, Dr. Meeker learned that Rounsevelle was being prescribed Vicodin by both Dr. Hardiman and himself, each without the other's knowledge, a fact subsequently confirmed by Dr. Hardiman. (Tr. 531). As a result, Dr. Meeker declined to issue her a Vicodin refill. (Tr. 429).

Rounsevelle began individual therapy and group counseling at Clackamas County Mental Health ("CCMH") in 2005. At her August 10, 2005, individual therapy session with Barbara

Page 9 - FINDINGS AND RECOMMENDATION

Breck, a licensed psychologist at CCMH, Rounsevelle complained of wrist pain and fear of her physically and emotionally abusive ex-boyfriend.  (Tr. 408).

In 2005, Rounsevelle submitted applications for disability insurance benefits ("DIB") and SSI under Titles II and XVI of the Act.[5]  In connection with those applications, the Social Security Administration (the "Administration") conducted a mental and physical residual functional capacity assessment ("RFCA") and a psychiatric review technique ("PRT").  The RFCAs and PRT, dated August 18, 2005, assessed a period of September 1, 2001 to August 15, 2005.  (Tr. 506-530).

In connection with the mental RFCA (Tr. 520-522), Administration medical consultant and clinical psychologist Karen Bates-Smith, Ph.D., conducted a review of Rounsevelle's medical records.  Dr. Bates-Smith found Rounsevelle's understanding and memory capabilities not significantly limited (Tr. 520), and her sustained concentration and persistence capabilities not significantly limited, except that her ability to maintain attention and concentration for extended periods was moderately limited.  (Tr. 520-521).  Dr. Bates-Smith further found Rounsevelle's social interaction capabilities not significantly limited, except that her ability to interact appropriately with the general public was markedly limited.  (Tr. 521).  Dr. Bates-Smith lastly found Rounsevelle's adaptation capabilities not significantly limited, except that her ability to set realistic goals or make plans independently of others was moderately limited.  (Tr. 521).  Dr. Bates-Smith concluded that, regarding "understanding and memory" and "sustained concentration and persistence," Rounsevelle was "able to understand & carry out simple and

_____

[5] This is not the applications proceeding at issue in this judicial review, except to the extent Rounsevelle assigns error to the ALJ's failure to reopen them.

complex, direction & instruction.  [She] is able to complete all tasks adequately & independently . . . [with] some difficulty concentrating at time."  (Tr. 522).  Regarding "social interaction" and "adaptation," Dr. Bates-Smith opined that Rounsevelle "should be precluded from any public contact secondary to her PTSD.  There is no evidence that she could not behave appropriately with coworkers or management.  [She] will benefit from vocational guidance."  (Tr. 522).

In connection with the PRT (Tr. 506-519), Dr. Bates-Smith classified Rounsevelle's mental health symptoms as falling under listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders).  (Tr. 506).  Regarding Affective Disorders, Dr. Bates-Smith found that Rounsevelle suffered from disturbance of mood accompanied by depressive syndrome, characterized by sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide.  (Tr. 509).  Regarding Anxiety-Related Disorders, Dr. Bates-Smith found that Rounsevelle had "[a]nxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by . . . [r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress."  (Tr. 511).

Dr. Bates-Smith further found that Rounsevelle had moderate "restriction of activities of daily living," moderate "difficulties in maintaining social functioning," mild "difficulties in maintaining concentration, persistence, or pace," and no "episodes of decompensation of an extended duration."  (Tr. 516).  The degree of limitation scale consists of degrees of none, mild, moderate, marked, and extreme, with only the degrees marked and extreme satisfying the functional criterion.  (Tr. 516).  Lastly, Dr. Bates-Smith found that the evidence did not establish the presence of the "C" criteria in connection with either Affective Disorders or Anxiety-Related Disorders.  (Tr. 517).

In connection with the physical RFCA (Tr. 523-530), Administration medical consultant

Mary Ann Westfall, M.D., likewise conducted a review of Rounsevelle's medical records. Dr. Westfall found no exertional (Tr. 524) or postural (Tr. 525) limitations. Dr. Westfall found that Rounsevelle should be limited to occasional twisting and turning of her wrists as well as occasional "overhead reaching secondary to her CTS and cervical spine DDD." (Tr. 526). Dr. Westfall found no visual (Tr. 526), communicative (Tr. 527), or environmental (Tr. 527) limitations. Dr. Westfall noted that Rounsevelle stated she had problems "lifting, squatting, bending, stooping, standing, reaching, talking, and hearing," and that these statements were corroborated by a third party. (Tr. 528). However, Dr. Westfall found Rounsevelle's statements not "fully credible as there [was] no basis for [Rounsevelle's] allegations of [impairments in] standing, and squatting as her MDI's [sic] would not cause these limitations." (Tr. 528).

Rounsevelle's prior applications for DIB and SSI were denied on August 19, 2005. (Tr. 138).

On September 12, 2005, Rounsevelle "had very big news" at individual therapy. (Tr. 408). Rounsevelle reported that her abusive ex-boyfriend Rob had died, "express[ing] relief and excitement that he was gone." (Tr. 408). Rounsevelle went as far as going "to view [his] body at the crematorium before it was cremated . . . in order to make sure that he was dead." (Tr. 408). Rounsevelle reported that she already felt better about leaving her house and being around other people, and felt "more relaxed and was able to focus enough to read a book," which was noteworthy given that "she had not been able to sit and read anything for years [and] was pleased that she was able to do that now." (Tr. 408).

On October 6, 2005, Ms. Breck learned that Rounsevelle had been arrested, charged, and ultimately convicted of possession of methamphetamine ("meth") in April of 2005, and was currently on probation. (Tr. 409). According to her probation officer ("PO"), Rounsevelle had

Page 12 - FINDINGS AND RECOMMENDATION

turned in four urinary analysis ("UA") tests positive for meth, and failed to keep her last appointment with her PO.  (Tr. 409).  When her PO made a home visit, Rounsevelle advised her that she was using meth three to four times per week.  (Tr. 409).  Ms. Breck opined that "[b]ecause of [her] lies and failure to disclose, it is difficult to know what is going on with [Rounsevelle].  (Tr. 409).

At an October 13, 2005, appointment with Dr. Meeker, Rounsevelle reported her medications, including a benzodiazepine, were no longer effective.  (Tr. 428).

Rounsevelle's prior drug use is documented more thoroughly in a November 16, 2005, alcohol and drug ("A&D") assessment (Tr. 384-407), which was filled out prior to her starting A&D group counseling at CCMH.  The A&D assessment stated that Rounsevelle's use of meth began at age thirty-five and evolved to daily usage.  (Tr. 386-387).  Rounsevelle stopped using for over four years, but as of November 16, 2005, she was using weekly, if not more frequently, and had used just days earlier.  (Tr. 386).  The A&D assessment also stated that Rounsevelle correlated her meth use to depression (Tr. 387), and that she had low motivation and poor self esteem.  (Tr. 406).  Rounsevelle began A&D group counseling on November 18, 2005.  (Tr. 410).

At a January 6, 2006, A&D group counseling session, Rounsevelle admitted to relapsing again on January 4, 2006.  (Tr. 412).  On January 10, 2006, Rounsevelle met with Dr. Meeker, complaining of severe mood swings and irritation.  (Tr. 428).  At a February 10, 2006, A&D group counseling session, Rounsevelle reported improvement, stating that she was feeling the positive effects of taking her medications and having meth out of her system.  (Tr. 413).  She reaffirmed this improvement at her February 14, 2006, appointment with Dr. Meeker.  (Tr. 427-428).  While her CTS still left her in pain, Dr. Meeker reported that Rounsevelle's depression and

Page 13 - FINDINGS AND RECOMMENDATION

anxiety symptoms had improved with Zyprexa.  (Tr. 427-428).

On August 11, 2006, Rounsevelle protectively filed an application for SSI.  (Tr. 138, 191-196).  She alleged a disability, beginning on September 30, 2001 (Tr. 138), based on a combination of impairments, the most severe and pertinent being PTSD with agoraphobia/anxiety and depressive/dysthymic disorder, personality disorder, DDD of the cervical spine, and CTS.  (Tr. 140, 290, 470).  She also alleged scoliosis, high cholesterol, and asthma.  (Tr. 216).

At an August 14, 2006, individual therapy session, Rounsevelle reported significant improvement since her January 2006 meth relapse (Tr. 412), particularly a healthy weight gain and overall physical and emotional improvement.  (Tr. 416).  While some PTSD symptoms still persisted, she reported that Dr. Meeker had developed a good medication regimen to help manage her PTSD, and that she was more stable than before.  (Tr. 416).  While Rounsevelle had considered looking for a part-time job, she reported lacking confidence in her ability to work, complained about her CTS, and was "concerned about lo[]sing [her] health insurance if she work[ed]."  (Tr. 416).

On October 18 and 19, 2006 (Tr. 444, 460, 469), in connection with Rounsevelle's August 14, 2006, SSI application, the Administration conducted a mental and physical RFCA and a PRT.  Unlike the 2005 RFCAs and PRT, which assessed a period from 2001 to 2005, the 2006 assessments were a "Current Evaluation."  (Tr. 458, 462).

In connection with the physical RFCA (Tr. 462-469), Administration medical consultant Martin Kehrli, M.D., conducted a review of Rounsevelle's medical records.  Dr. Kehrli found Rounsevelle capable of occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying ten pounds, standing and/or walking approximately six hours in an eight-hour workday,

Page 14 - FINDINGS AND RECOMMENDATION

and sitting about six hours in an eight-hour workday, and not limited in her ability to push and/or pull.  (Tr. 463).  Dr. Kehrli then found Rounsevelle capable of occasionally climbing a ladder/rope/scaffold and crawling, and capable of frequently climbing ramps/stairs, balancing, stooping, kneeling, and crouching.  (Tr. 464).  Dr. Kehrli further found Rounsevelle limited in reaching in all directions (including overhead), handling (gross manipulation), and fingering (fine manipulation), stating that Rounsevelle "has DDD in [cervical] spine and bilat[eral] CTS. She is limited to freq[uent] bilat[eral] overhead reach and frequent bilat[eral] handle/finger/grasp."  (Tr. 465).  Lastly, Dr. Kehrli found that Rounsevelle had no visual, communicative, or environmental limitations.  (Tr. 465-466).

Dr. Kehrli noted that in August of 2006, Rounsevelle reported both mental and physical improvement.  (Tr. 416, 469).  Furthermore, Dr. Kehrli found Rounsevelle's statements regarding the severity of her limitations to be only partially credible, due in part to Rounsevelle's history of meth abuse and the issue involving her getting Vicodin from two doctors simultaneously.  (Tr. 429, 469, 531).  Dr. Kehrli concluded that Rounsevelle "is capable of performing light level work on a consistent basis.  Therefore, Light RFC."  (Tr. 469).

In connection with the mental RFCA (Tr. 458-461), Administration medical consultant Peter LeBray, Ph.D., conducted a review of Rounsevelle's medical records.  Dr. LeBray found Rounsevelle's understanding and memory capabilities not significantly limited, except that her ability to understand and remember detailed instructions was moderately limited, and found her sustained concentration and persistence capabilities not significantly limited, except that her ability to carry out detailed instructions and maintain attention and concentration for extended periods was moderately limited.  (Tr. 458).  Dr. LeBray then found Rounsevelle's social interaction capabilities not significantly limited, except that her ability to interact appropriately

Page 15 - FINDINGS AND RECOMMENDATION

with the general public was moderately limited.  (Tr. 459).  Rounsevelle's moderately limited

ability to interact appropriately with the general public was an improvement from her 2005

mental RFCA, where Dr. Bates-Smith found her markedly limited.  (Tr. 521).  Dr. LeBray lastly

found Rounsevelle's adaptation capabilities not significantly limited, except that her ability to set

realistic goals or make plans independently of others was moderately limited.  (Tr. 459).

In his conclusion, Dr. LeBray opined that, regarding "understanding and memory" and

"sustained concentration and persistence," Rounsevelle could "understand, remember, and

complete simpler instructions, infrequently rushed tasks/procedures on [a] routine basis."  (Tr.

458-459, 460).  Regarding "social interaction," Dr. LeBray further opined that Rounsevelle was

"limited to interactions that require[d] minimal contact [with the] general public as well as

limited contact [with] peers/coworkers.  [She is] [r]esponsive to supportive lay supervision (not

overly harsh, critical style)."  (Tr. 459, 460).  Lastly, regarding "adaptation," Dr. LeBray opined

that Rounsevelle "will do best given a set routine to follow and help set realistic goals."  (Tr.

459, 460).

The last element in this course of assessing Rounsevelle's current condition was the PRT

(Tr. 444-457), also conducted by Dr. LeBray.  (Tr. 444-457).  In Part I, the medical summary,

Dr. LeBray classified Rounsevelle's mental impairments as falling under listings 12.04

(Affective Disorders), 12.06 (Anxiety-Related Disorders), and (12.09 Substance Addiction

Disorders).  (Tr. 444).

Part II consisted of documenting the factors that evidence the three disorders above.  (Tr.

445-453).  For all three disorders, Dr. LeBray found that "[a] medically determinable impairment

is present that does not precisely satisfy the diagnostic criteria above."  (Tr. 447, 449, 452).  As

to Affective Disorders, Dr. LeBray found that the disorder was primarily comprised of

Page 16 - FINDINGS AND RECOMMENDATION

"[d]epression/anxiety (on [prescription management with] good response per [her] [primary care physician])."  (Tr. 447).  As to Anxiety-Related Disorders, Dr. LeBray found that the disorder was primarily comprised of "[a]nxiety/depression (h/o PTSD per MH MEOR [medical evidence of record])."  (Tr. 449).  Lastly, as to Substance Addiction Disorders, Dr. LeBray found that the disorder was primarily comprised of "mixed DAA in early remission (since [January 20]06 to p[resent])."  (Tr. 452).

Part III consisted of rating Rounsevelle's four functional limitations, from lowest to highest degree of limitation (none, mild, moderate, marked, and extreme), with only marked and extreme satisfying the functional criterion.  (Tr. 454-455).  Dr. LeBray found Rounsevelle to have (1) a mildly limited "restriction of activities of daily living," (2) moderately limited "difficulties in maintaining social functioning," (3) moderately limited "difficulties in maintaining concentration, persistence, or pace," and (4) no "episodes of decompensation, each of extended duration."  (Tr. 454).  In Part III.B, the "C" criteria of the listings, Dr. LeBray found that the evidence did not establish presence of the "C" criteria for Affective Disorders or Anxiety-Related Disorders.  (Tr. 455).

Lastly, Part IV contained Dr. LeBray's summary of his (1) analysis of current medical and all non-medical evidence and (2) assessment of consistency of the evidence and resolution of material conflicts.  (Tr. 456).  In his analysis of current medical and non-medical evidence, Dr. LeBray noted Rounsevelle's recent improvement and stabilization.  In May of 2006, Rounsevelle reported that Zyprexa was "working very well for [her] depression," she had been "clean and sober since [January 2006]," and she was "[c]onsidered stable on [her] med[ication]s and [her] home life [was] more stable."  (Tr. 456).  In August of 2006, Rounsevelle "reported feeling better physically and emotionally and feeling more stable," that her medication regimen was working

Page 17 - FINDINGS AND RECOMMENDATION

well, and that "she was considering getting a [part-time] job but didn't want to l[]ose her health insurance," and even discussed vocational rehabilitation.  (Tr. 456).

In his assessment of consistency of the evidence and resolution of material conflicts, Dr. LeBray noted Rounsevelle "allege[d] severe PTSD and multiple other physical complaints which causes anxiety attacks," had diagnoses of anxiety and depression, and had a history of meth use. (Tr. 456).  Dr. LeBray further noted that, while Rounsevelle reported that she feared running into her abusive ex-boyfriend, she had previously told her therapist that since his death in September of 2005, it had been easier to leave her home and be around others.  (Tr. 456).  Dr. LeBray concluded that Rounsevelle's statements were only partially credible.  (Tr. 456).

On October 20, 2006, a Vocational Decision Worksheet was completed by Disability Analyst Amanda Dinan, who concluded that, while Rounsevelle was incapable of performing any past relevant work, she was "capable of performing other work," including surveillance system monitor, kosher inspector, and blending tank helper.  (Tr. 257-258).

On October 24, 2006, Rounsevelle met with Dr. Meeker, complaining of persistent symptoms of depression.  (Tr. 425).  Due to her worsening depression, Dr. Meeker increased Rounsevelle's Zyprexa dosage.  (Tr. 425).  On October 25, 2006, Rounsevelle attended A&D group counseling and was an active group participant.  (Tr. 360).  She was a "no show" to the following six consecutive A&D group counseling sessions, from November 1 to December 6, 2006.  (Tr. 360, 369-374).  Rounsevelle did attend her individual therapy session with Ms. Breck on November 7, 2006.  (Tr. 361, 368).  As Rounsevelle was leaving, she stopped and spoke with Wilma Gardner-Watson, from CCMH's Care Coordination, who reported that Rounsevelle stated she would make an appointment to start the vocational rehabilitation enrollment process.  (Tr. 361, 368).

Page 18 - FINDINGS AND RECOMMENDATION

On November 16, 2006, the Administration denied Rounsevelle's application for SSI, finding her not disabled.  (Tr. 154-157).  On December 18, 2006, Rounsevelle timely filed a request for reconsideration of the adverse decision.  (Tr. 158).  In response to with Rounsevelle's request for reconsideration, the Administration had Rounsevelle's "claim independently reviewed by a physician and disability examiner."  (Tr. 170, 442-443).

On March 13, 2007, Administration medical consultant Linda Jensen, M.D., DABPMR,[6] conducted a review of Rounsevelle's physical condition.  (Tr. 443).  In addition to the physical impairments discussed in her SSI application, Rounsevelle claimed in her request for reconsideration that she further suffered from periodontal disease, "which has caused severe headaches and toothaches."  (Tr. 263, 443).  She also claimed that the "arthritis in [her] neck, arms and back ha[d] gotten worse."  (Tr. 263, 443).  Furthermore, Rounsevelle stated she had to increase the dosage of her anxiety and depression medications, was suffering from severe vertigo, and had ringing in her ears (tinitis).  (Tr. 263, 443).

Dr. Jensen first concluded that, while Rounsevelle's periodontal disease is not evident in file nor supported by the evidence, its validity was irrelevant as it would not limit her functioning anyway.  (Tr. 443).  Like her periodontal disease, Dr. Jensen also found Rounsevelle's allegations of severe headaches to be unsupported by the evidence.  (Tr. 443).  Furthermore, Dr. Jensen found only one chart note referencing Rounsevelle having a benign tremor and vertigo, but the conditions were "not severe and would pose no further limitations on her RFC."  (Tr. 443).  Dr. Jensen concluded that "[t]he limited light RFC remains reasonable and is adopted."

_____

[6] Diplomate, American Board of Physical Medicine and Rehabilitation.  *See* https://www.abpmr .org/diplomates/diplomates.html.

(Tr. 443).

On March 14, 2007, Administration medical consultant and psychologist Dorothy Anderson, Ph.D., conducted a review of Rounsevelle's mental condition.  (Tr. 442).  Dr. Anderson found that "[m]entally, there are several credibility issues.  [Rounsevelle] alleges that she has social anxiety so bad since 2002 that she never leaves the house, yet is on probation for meth use, attends many groups each week and has no signs of anxiety."  (Tr. 442).  Dr. Anderson continued to question Rounsevelle's credibility and motive, finding that "[m]uch of [Rounsevelle's] motive for getting on SSI is revealed in the chart notes from the mental health center, where she says she'[d] like to work but does not want to pay child support."  (Tr. 442). Furthermore, Dr. Anderson found "credibility issues related to [Rounsevelle's] meth use/relapse and concern by at least one doctor that she is drug-seeking."  (Tr. 442).  Like Dr. Jensen, Dr. Anderson concluded that the previous RFC assessment remained reasonable.  (Tr. 442).

On March 15, 2007, after "[t]he evidence in [Rounsevelle's] case [was] thoroughly evaluated," the Administration "f[ou]nd that the previous determination denying [Rounsevelle's] claim was proper under the law."  (Tr. 170).  On April 18, 2007, Rounsevelle timely requested a hearing by an ALJ to review the Administration's adverse decision.  (Tr. 172).

In 2007, Rounsevelle's attendance at individual therapy and A&D group counseling continued to be inconsistent.  (Tr. 328-334, 362-366).  From January 2 to December 31, 2007, of the 51 CCMH individual therapy and group counseling "progress notes" in the record, Rounsevelle either cancelled or was a no show to 36 of them.  (Tr. 328-334, 362-366).  When Rounsevelle did attend individual therapy and group counseling, progress notes generally reflected its positive impact on her and that she was showing improvement.  (Tr. 328-334, 362-366).

Page 20 - FINDINGS AND RECOMMENDATION

On June 5, 2007, Kathleen Goldstein, a Licensed Counselor of Social Work ("LCSW") at CCMH, stated that Rounsevelle would "engage [in] therapy but [did not] appear to be motivated to sustain gr[ou]p [counseling] at [that] time.  Outreach was attempted but no follow-up. . . . Prognosis would likely be good if [Rounsevelle] continue[d] to maintain sobriety.  She appear[ed] to be effective with goals and self care when she [was] clean."  (Tr. 351). Rounsevelle's counselors continued to bring up vocational rehabilitation, on April 12 (Tr. 363) and May 2, 2007 (Tr. 364), and again on October 25, 2007, when Ms. Breck reported that Rounsevelle had "not been following through with voc[ational] rehab[ilitation] and continue[d] to wait for [SSI]."  (Tr. 332).

On July 9, 2007, Rounsevelle met with Dr. Meeker, complaining of depression, anxiety, and panic attacks, prompting Dr. Meeker to increase her Seroquel dosage.  (Tr. 423).  Dr. Meeker reported that Rounsevelle also "told [him] about her past history of Heroin abuse two years ago," which had not previously been disclosed in the record.  (Tr. 423).  On October 25, 2007, Rounsevelle met with Dr. Meeker, complaining of depression, and "ha[d] gone downhill" since a break up the prior month.  (Tr. 422).  She admitted that not having a boyfriend was causing her depression.  (Tr. 422).

At her December 17, 2007, appointment with Dr. Meeker, Rounsevelle complained of depression and anxiety, indicating that she was "afraid of going out into public because she may say something inappropriate."  (Tr. 421).  Again, Dr. Meeker reported that Rounsevelle's counselor at CCMH recommended she "go through vocational training for a job."  (Tr. 421).

On or around December 17, 2007, Rounsevelle began attending mental health ("MH")

group therapy at CCMH, in addition to A&D group counseling.[7]

Rounsevelle's progress notes in 2008 from her counselors at CCMH paint a picture showing little change from 2007, both in her overall effort and the results from treatment. Of the 54 CCMH progress notes in the record spanning January 4 to September 10, 2008, Rounsevelle's counselors reported that she either cancelled or was a no show to 36 of the sessions. (Tr. 334-346).

When Rounsevelle did attend, her most common complaints to counselors were the same as in the previous years. (Tr. 328-346, 362-366). Rounsevelle's common complaints pertained to (1) the side effects and ineffectiveness of her medications, including benzodiazepines, although she overtook her medications and ran out early multiple times[8] (Tr. 339, 419), (2) her PTSD symptoms, chiefly dysthymia (depression), agoraphobia (anxiety) panic attacks (deemed "mild" – lasting less than 15 minutes), and nightmares, (3) being upset for no particular reason, (4) her general lack of self-confidence and self-worth, critical and negative self-image, and low self-esteem, and (5) continuing drug temptation. (Tr. 334-346). While the impairments she complained about were almost always some combination of the above, they seemingly varied each session. (Tr. 334-346).

Notwithstanding the foregoing, throughout 2008, Rounsevelle reported improved anxiety and her counselors reported how encouraged they were by her improvement and her use of

---

[7] It is not clear based on the record exactly when Rounsevelle began MH group therapy, as CCMH's progress notes did not distinguish between the different groups before December 17, 2007.
[8] Rounsevelle "said she forgot to take the medication and then took too many. She has [sic] running out of medication a few days early." (Tr. 419). "[Rounsevelle] noted that she had been overtaking her medications and had run out several days early." (Tr. 339).

Page 22 - FINDINGS AND RECOMMENDATION

various coping mechanisms. (Tr. 334-346). Rounsevelle worked on positive self talk and breathing exercises to help control panic attacks, "which [were] immediately relaxing to her." (Tr. 343). She also learned about "the anatomy of a panic attack and [began] understand[ing] how thoughts help[ed] create them." (Tr. 343).

On February 11, 2008, Ms. Breck reported that Rounsevelle was reticent to take steps towards progress, unrealistically waiting until she felt better about herself and had her anxiety more under control. (Tr. 336). But, as Ms. Breck observed, "sometimes it takes doing it in order to actually get a handle on it." (Tr. 336).

On March 10, 2008, Rounsevelle relapsed, failing a UA by testing positive for meth (Tr. 338), which she attempted to excuse by explaining "that she only took a couple puffs on a pipe on one occasion." (Tr. 340).

On March 24, 2008, Rounsevelle met Dr. Meeker complaining of depression and anxiety. (Tr. 419). Like her CCMH counselors (Tr. 339), Dr. Meeker reported Rounsevelle was again overtaking her medications and running out early. (Tr. 419).

On April 21, 2008, she again saw Dr. Meeker, complaining that her medications were ineffective and that she was experiencing anxiety, social phobia, and was unable to sleep. (Tr. 419). Noting her recent relapse, Dr. Meeker stated that Rounsevelle "ha[d] been untruthful about her drug use." (Tr. 419). Rounsevelle met with Dr. Meeker again on April 28, 2008, complaining of depression, psychological stress, and anxiety. (Tr. 418). Dr. Meeker reported Rounsevelle's agitation in admitting her meth relapse the previous month, and that she did not have any side effects from the medication. (Tr. 418). On June 9, 2008, Rounsevelle met with Dr. Meeker to check her cholesterol, which he found to be at an acceptable level, and he reported that she was otherwise doing well. (Tr. 418).

Page 23 - FINDINGS AND RECOMMENDATION

Throughout May and June of 2008, Rounsevelle stated multiple times in therapy and counseling that she felt significantly improved after stopping her benzodiazepine regimen (she was "glad to be off them," "feeling good now that she has the benzodiazepines out of her system," and was "very glad to be off benzodiazepines and feels she functions much better as a result"). (Tr. 341-343). On June 23, 2008, Rounsevelle discussed in A&D group counseling "how her life ha[d] changed since she quit using [meth] and the losses incurred as a result of [her meth] addiction." (Tr. 344).

At A&D group counseling on July 7, 2008, Rounsevelle reported she had been experiencing fewer panic attacks over the prior few weeks and "discussed several areas of her life that she felt [were] doing well." (Tr. 344). On July 9, 2008, Rounsevelle "reported that her week was good and that she ha[d] been using good skills to cope with physical issues." (Tr. 344).

Rounsevelle seemed unable to sustain this improvement and had a pattern of progress followed by regression. (Tr. 334-346). Scattered throughout her progress notes were reports of Rounsevelle's near complete inactivity (Tr. 335), complaints of boredom (Tr. 335), ambivalence towards attending group therapy (Tr. 335), and a report that Dr. Meeker "made some comments about her being able to work." (Tr. 340). She continued to fail to attend the majority of her scheduled sessions. Even when Rounsevelle appeared enthusiastic about recovery, the enthusiasm would be short-lived. On July 14, 2008, Rounsevelle's A&D group counselor reported that they "discussed commitment to recovery," yet on July 16, 2008, just two days later, she did not show up to her MH group therapy session. (Tr. 345). In fact, after her July 14, 2008, A&D group counseling session, Rounsevelle did not attend the next seven consecutive individual and group sessions. (Tr. 345).

Page 24 - FINDINGS AND RECOMMENDATION

On August 27, 2008, Rounsevelle's MH group therapy counselor reported "that [Rounsevelle] was eager to come to group and report how she has been effectively using skills," though this was directly followed by two consecutive no shows to MH group therapy.  (Tr. 346).

On September 10, 2008, CCMH psychiatrist Donald Matsunaga, M.D., completed a "Discharge Summary" for Rounsevelle.  (Tr. 287-291).  The reason for her discharge was not explicitly stated, with the only explanation coming from a "[Patient] in agreement" comment under "Reason for Discharge" and a comment by a counselor in an August 7, 2008, report that Rounsevelle "said that she did not want to be in the [A&D] group any longer because she fe[lt] that she ha[d] resolved her substance use issues."  (Tr. 287, 345).  Dr. Matsunaga opined that Rounsevelle's "mood and anxiety problems appear[ed] to be a constellation of the PTSD, although [he] suspect[ed] they [were] anchored in her personality issues," and she "might have a cluster B mixed personality disorder or features," although this theory was not elucidated in any more detail.  (Tr. 290).

On December 3, 2008, Rounsevelle began individual and group therapy again at CCMH.  (Tr. 295).  While she had been attending both A&D and MH group counseling, upon her return, she only attended MH group therapy.  (Tr. 295-298).  On December 3, 2008, her first day back, her MH group therapy counselor stated that "[Rounsevelle] report[ed] that for the first time in many years and possibly her whole life, she [was] happy due to the utilization of mindfulness skills.  [Rounsevelle] discussed how she and her mother now get along due to interpersonal effectiveness skills."  (Tr. 295).  Rounsevelle did not attend her last four scheduled therapy sessions of 2008.

On January 7, 2009, Rounsevelle's MH group therapy counselor reported Rounsevelle's improvement and positive mindset, stating that "[Rounsevelle] said that she f[e]l[t] this group

Page 25 - FINDINGS AND RECOMMENDATION

ha[d] helped her because of reduced anxiety and depression and feeling happier in her life and better able to cope with stressors."  (Tr. 295).  On January 12, 2009, Rounsevelle met with Dr. Meeker, complaining of headaches, neck pain, and trouble sleeping.  (Tr. 299).  Dr. Meeker prescribed Halcion , a benzodiazepine, as a sleep aid and recommended she continue taking Advil and Ultram for neck pain.  (Tr. 299).  Dr. Meeker also reported Rounsevelle's continuing mental and emotional struggles, though he did note that she was "attending group sessions with counseling therapy and seems to be doing quite well."  (Tr. 299).

After cancelling her scheduled session of January 14, 2009, Rounsevelle attended MH group therapy on January 21, 2009, reporting her struggle to remember and implement skills she was learning in class once she went home.  (Tr. 296).  Rounsevelle returned to Dr. Meeker on January 22, 2009, complaining of neck pain and trouble sleeping.  (Tr. 299).  Dr. Meeker reported that her neck was "nontender" with a "good range of motion," and opined that her "[n]eck pain [was] probably muscle spasm."  (Tr. 299).  As Halcion had proven ineffective, Dr. Meeker prescribed Flexeril as a sleep aid.  (Tr. 299).

At her January 27, 2009, individual therapy session with Kathryn Reder, a Licensed Professional Counselor ("LPC") at CCMH, Rounsevelle reported experiencing disturbing dreams, and that while "she ha[d] not used substances for 8 months, sometimes she fe[lt] that she [was] barely holding on to her recovery."  (Tr. 296).  Rounsevelle nevertheless reported that therapy was positively impacting her life, including that "by using interpersonal effectiveness skills she was able to create a better relationship with her mother. . . . She also acknowledged how she is able to calm herself down."  (Tr. 296).

After cancelling her scheduled session of January 28, 2009, Rounsevelle attended MH group therapy on February 4 and 11, 2009, where she reiterated that her "life and relationship

Page 26 - FINDINGS AND RECOMMENDATION

with her mother ha[d] improved as a result of skills she [was] learning." (Tr. 296-297). At individual therapy on February 12, 2009, while bothered because "[s]he fe[lt] that she [was] being closed in on by 'jerks' who are rude while [grocery] shopping," Rounsevelle reported "that she [was] beginning to understand the meaning of mindfulness and how to do it effectively" (Tr. 297), and that "her li[f]e [was] much more calm as a result of learning DBT Skills." (Tr. 297).

On March 4, 2009, after not attending her four preceding therapy sessions, her MH group therapy counselor reported that Rounsevelle "w[ould] be dropped from the group." (Tr. 298). Rounsevelle did attend MH group therapy on March 11, 2009, but it was her last session of any kind until July of 2009.

On April 13, 2009, a video teleconference hearing was held before an ALJ, attended by Rounsevelle, her attorney, and a vocational expert. (Tr. 109-132). Rounsevelle and the vocational expert testified at the hearing. (Tr. 109-132). On June 19, 2009, the ALJ denied Rounsevelle's application for SSI. (Tr. 135-150).

On July 16, 2009, Rounsevelle timely requested review of the ALJ's decision. (Tr. 86-88). On December 3, 2010, the Appeals Council denied Rounsevelle's request for review. (Tr. 93-95). On May 3, 2011, Rounsevelle filed a brief before the Appeals Council (Tr. 282-286), urging the Appeals Council to overturn the ALJ's decision because it was "not based on substantial evidence or the correct application of law." (Tr. 283).

On September 13, 2012, the Appeals Council set aside its December 3, 2010, denial, and after considering additional information and adding Rounsevelle's May 3, 2011, brief to the record, again denied Rounsevelle's request for review. (Tr. 1-5). Consequently, the ALJ's decision of June 19, 2009, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This

Page 27 - FINDINGS AND RECOMMENDATION

action followed.

## SUMMARY OF ALJ FINDINGS

The ALJ issued a decision finding Rounsevelle not disabled for purposes of her

application for benefits on June 19, 2009.  (Tr. 135-150).  At the first step of the five-step

sequential evaluation process, the ALJ found that Rounsevelle had not engaged in substantial

gainful activity at any time following her application date of August 11, 2006.  (Tr. 140).  He

therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Rounsevelle's "depressive disorder/anxiety

disorder, post traumatic stress disorder (PTSD)," "degenerative disk disease, cervical spine," and

"bilateral carpal tunnel" were "severe impairments"[9] for purposes of the Act.  (Tr. 140-141).  In

light of that finding, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Rounsevelle's impairments were the

equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  (Tr. 141-

143).  The ALJ therefore properly conducted an assessment of Rounsevelle's RFC.  (Tr. 143-

149).  Specifically, the ALJ found that during the relevant adjudication period, Rounsevelle had:

> [T]he residual functional capacity to perform light work as defined in 20 CFR
> 416.967(b), that requires little or no judgment in the performance of simple duties
> that can be learned on the job in a short period of time (unskilled work as defined
> in CFR 416.968(a)), precludes public interaction as a primary requirement with
> bilateral manipulation that is no more than frequent.

(Tr. 143).  In reaching this finding, the ALJ considered all of the objective medical evidence in

_____

[9] 20 C.F.R. § 416.920(c) ("You must have a severe impairment.  If you do not have any
impairment or combination of impairments which significantly limits your physical or mental
ability to do basic work activities, we will find that you do not have a severe impairment and are,
therefore, not disabled.  We will not consider your age, education, and work experience.").

Page 28 - FINDINGS AND RECOMMENDATION

the record, as well as Rounsevelle's own statements regarding her symptoms.  (Tr. 143).

At the fourth step of the five-step process, the ALJ found that Rounsevelle had no past relevant work.  (Tr. 149).

At the fifth step, the ALJ found, in light of Rounsevelle's age, education, work experience, and RFC, that there were jobs existing in significant numbers in the national and local economy, the duties of which she could perform.  (Tr. 149).  Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled and light or sedentary jobs that Rounsevelle could perform, notwithstanding the limitations listed in her RFC: copy machine operator (DOT number 207.685-014, with 87,240 jobs in the national economy and 950 jobs in the Oregon economy), document scanner or preparer (DOT number 249.587-018, with 2,980,000 jobs in the national economy and 39,000 jobs in the Oregon economy), and cafeteria helper (DOT number 311.677-010, with 401,000 jobs in the national economy and 4,080 jobs in the Oregon economy).  (Tr. 150).  Based on the finding that Rounsevelle could perform the duties of jobs existing in significant numbers in the national economy, the ALJ concluded that she was not disabled as defined in the Act at any time between August 11, 2006, and June 19, 2009.  (Tr. 150).

## ANALYSIS

Rounsevelle challenges the Commissioner's characterization of her mental disorders at the second step of the evaluation process, decision not to consider her personality disorder in assessing her RFC, assessment of her RFC, in that it should have contained more limitations, failure to question the vocational expert regarding the possibility of a conflict existing between

her testimony and the Dictionary of Occupational Titles[10] ("DOT"), and decision not to order a consultative mental examination.  Rounsevelle further challenges the Commissioner's decision not to reopen her prior DIB and SSI applications that were denied on August 19, 2005 (Tr. 138) and the Appeals Council's decision not to consider additional evidence she submitted after the ALJ issued his decision.

## I.    Decision Not to Reopen Previous DIB & SSI Applications

During the April 13, 2009, hearing before the ALJ (Tr. 109-132), Rounsevelle's attorney asked the ALJ to reopen Rounsevelle's previously filed concurrent applications for DIB and for SSI, which were denied in 2005, without appeal.  (Tr. 113, 138).  The ALJ explained that "[t]he time for reopening is satisfied here under 20 CFR 416.1488(a) because the current application was filed on August 15, 2006, which is within 12 months of the prior initial determination of August 19, 2005."  (Tr. 138).  While Rounsevelle satisfied the timing requirements, under SSR 88-1c,[11] the ALJ's jurisdiction over previously filed applications is discretionary.  The ALJ declined to reopen Rounsevelle's prior DIB and SSI applications, "as no new and material evidence has been submitted which would indicate that the determination rendered was in error (20 CFR 416.1489)."  (Tr. 138).

Rounsevelle contends that by considering medical evidence from a prior adjudicated period, in this case 2004-2005, that the ALJ *de facto* reopened Rounsevelle's prior claims.  "Res

_____

[10] "The Social Security Administration has taken administrative notice of the *Dictionary of Occupational Titles*, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs. *See* 20 C.F.R. § 416.966(d)(1); *Prochaska* [*v. Barnhart*], 454 F.3d [731,] 735 n. 1 [(7th Cir. 2006)]." *Massachi v. Astrue*, 486 F.3d 1149, 1153 n. 8 (9th Cir. 2007).

[11] SSR 88-1c (March 8, 1988), http://www.socialsecurity.gov/OP_Home/rulings/oasi/33/SSR88-01-oasi-33.html.

judicata does not apply when an ALJ later considers 'on the merits' whether the claimant was disabled during an already-adjudicated period." *Lewis v. Apfel*, 236 F.3d 503, 510 (9th Cir. 2001), *citing Lester v. Chater*, 81 F.3d 821, 827 n. 3 (9th Cir.1995).  However, "where the discussion of the merits is followed by a specific conclusion that the claim is denied on res judicata grounds, the decision should not be interpreted as re-opening the claim and is therefore not reviewable." *Krumpelman v. Heckler*, 767 F.2d 586, 589 (9th Cir. 1985), *citing McGowen v. Harris*, 666 F.2d 60, 68 (4th Cir. 1981).  Here, the ALJ, as in *Krumpelman*, expressly declined to reopen the prior determination (Tr. 138), and therefore did not *de facto* reopen Rounsevelle's prior claims.  767 F.2d at 589.

Rounsevelle's argument that the ALJ's consideration of evidence from a prior adjudicated period constitutes a *de facto* reopening is additionally unavailing because the ALJ was required to consider the evidence at issue.  20 C.F.R. § 416.912(d) requires that an ALJ "develop [claimant's] complete medical history for at least the 12 months preceding the month in which [he or she] file[s] [an] application unless there is a reason to believe that development of an earlier period is necessary."  Given that the current application was filed in August of 2006, 20 C.F.R. § 416.912(d) required the ALJ to develop Rounsevelle's medical history back through at least July of 2005, which is earlier than the August 2005 evidence upon which Rounsevelle premises her argument.  The Commissioner's decision therefore should not be disturbed on the basis that the ALJ declined to reopen Rounsevelle's prior claims.

## II.    ALJ's Consideration of Rounsevelle's Mental Impairments at Step 2

Rounsevelle contends the ALJ erred at the second step of the sequential evaluation process because he did not identify anxiety disorder, depressive disorder, PTSD, and personality disorder as disparate severe impairments.

Page 31 - FINDINGS AND RECOMMENDATION

A.        **Anxiety and Depression – PTSD Combination**

At the second step of the five-step sequential evaluation process, the ALJ found that Rounsevelle suffered from three different severe impairments, one of which he characterized as "depressive disorder/anxiety disorder, post traumatic stress disorder (PTSD)."  (Tr. 140). Rounsevelle claims this characterization was an improper combination of two disparate mental impairments, namely depression disorder and anxiety disorder.

Rounsevelle argues that the facts in the present case are analogous to those in *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012), where the Plaintiff was diagnosed with separate impairments, specifically anxiety and panic disorder.  At the second step of the evaluation process in *Hill*, the ALJ found a severe impairment of anxiety but "excluded the panic disorder diagnosis and improperly limited the definition of panic attack to only those attacks severe enough to collapse someone to the ground."  *Id.*  The Ninth Circuit concluded that, "[b]ecause the ALJ excluded panic disorder from Hill's list of impairments and instead characterized her diagnosis as anxiety alone, the residual functional capacity determination was incomplete, flawed, and not supported by substantial evidence in the record."  *Id.*

Here, unlike in *Hill*, the ALJ did not improperly restrict the definition of either anxiety disorder or depression disorder, and did not fail to consider either disorder in assessing Rounsevelle's RFC.  After characterizing one of Rounsevelle's severe impairments as caused by "depressive disorder/anxiety disorder, post traumatic stress disorder (PTSD)" (Tr. 140), the ALJ "analyzed the claimant's . . . PTSD with depressive and anxiety symptoms under 12.04 and

12.06."[12]  (Tr. 142).  The ALJ analyzed Rounsevelle's anxiety symptoms and depression

symptoms separately and distinctly, not as a "hybrid mental disorder"[13] as Rounsevelle alleges.

(Tr. 141-143).  As the ALJ explained, "the claimant's violently abusive relationship . . . caused

the claimant PTSD with symptoms of anxiety and depression."  (Tr. 146).  In her disability report

of 2006, Rounsevelle characterized her impairments in similar fashion.  (Tr. 216).  The ALJ did

not err by grouping this constellation of symptoms together for purposes of discussion, and did

not improperly conflate the two disorders.

 Moreover, even if the ALJ's characterization or analysis of Rounsevelle's impairments

had been in error, any such error would be harmless.  The Ninth Circuit "defined the step-two

inquiry as 'a de minimis screening device to dispose of groundless claims.'"  *Edlund*, 253 F.3d at

1158, *quoting Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

### B. Personality Disorder

 Rounsevelle contends that she was diagnosed with personality disorder and that the ALJ

erred by not making any finding in connection with this potentially impairing condition.  The

possibility that Rounsevelle suffers from personality disorder was first reported in connection

with the comprehensive psychological evaluations performed by Dr. Ude in 1996.  (Tr. 542-

559).  Dr. Ude employed the Millon Clinical Multiaxial Inventory ("MCMI") and the Minnesota

Multiphasic Personality Inventory ("MMPI") "as an objective measure of personality

functioning," which produced results of "borderline validity."  (Tr. 556-557).  In connection with

--------

[12] Listings 12.04 and 12.06 are subsections of 12.00 Mental Disorders within the Listing of
Impairments, 20 C.F.R. § 404, subpt. P, app. 1, *available at* http://www.ssa.gov/OP_Home/cfr20
/404/404-app-p01.htm.
[13] Pl.'s Reply Br., 4.

Page 33 - FINDINGS AND RECOMMENDATION

the MCMI, "Rounsevelle responded in such a way that the results [were] only marginally valid.

Even with correction for denial tendencies, a *very* large percentage of the responses were marked

'false.'  This tended to lower the pathological elevation of the scales."  (Tr. 556) (emphasis

original).  "The MMPI . . . was also on the cusp of being invalid due to a negative (answering

'false') response set.  Seventy-three percent of the responses were false.  Again, this severely

lowered the elevation of the pathology markers of this test."  (Tr. 557).

Upon interpreting and analyzing the results of the MCMI and MMPI, along with various

other instruments, and in reliance on the *Diagnostic and Statistical Manual of Mental Disorders*

("DSM") (Tr. 547), Dr. Ude's "diagnostic impression" was that Rounsevelle had "Personality

Disorder, NOS (with Paranoid, Narcissistic, and Passive-Aggressive features)."  (Tr. 543, 558).

At Rounsevelle's follow-up evaluation approximately eight months later, the diagnostic

impression was nearly identical (other than the omission of "Paranoid" features), and Dr. Ude

similarly diagnosed Rounsevelle with "Personality Disorder with mixed emotional features,

primarily narcissistic and passive-aggressive."  (Tr. 549).

On April 2, 2008, Dr. Matsunaga conducted a "Psychiatric Evaluation" of Rounsevelle.

(Tr. 310-316).  Dr. Matsunaga summarized Dr. Ude's 1996 evaluations, and noted her

personality disorder diagnosis.  (Tr. 310-311).  In his own analysis, Dr. Matsunaga diagnosed

Rounsevelle with PTSD, dysthymic disorder, panic disorder with agoraphobia, and amphetamine

abuse, further opining that Rounsevelle's "mood and anxiety problems appear to be a

constellation of the PTSD, although I suspect they are anchored in her personality issues," and

Page 34 - FINDINGS AND RECOMMENDATION

that she "may have a cluster B[14] mixed personality disorder or features."  (Tr. 314).

However, Dr. Matsunaga further reported that a CCMH treating therapist had "noted that while [Rounsevelle] has challenges, she ha[d] maintained emotional stability, except during periods of what later were discovered to be meth use." (Tr. 316).  Regarding Rounsevelle's personality evaluation and untruthfulness about meth usage, Dr. Matsunaga stated that, "[t]aken as a whole it is difficult to see what may be the horse and what may be the cart" (Tr. 316), and that "[n]otes from DHS implied it was difficult to trust her statements, and experience at CCMH tends to support that concern," and that he had "reliability concerns."  (Tr. 316).

Finally, on April 28, 2008, Dr. Meeker reported that, along with depression and anxiety, Rounsevelle presented with "a component of personality disorder."  (Tr. 418).  No other health care provider has provided any opinion of record regarding Rounsevelle's possible personality disorder.

I take judicial notice that the DSM, the source Dr. Ude relied upon in her original tentative diagnosis of Personality Disorder NOS, states that, to be diagnosed with personality disorder, the medical provider must determine that the patient's behavioral "pattern is not better accounted for as a manifestation or consequence of another mental disorder . . . and is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, exposure to a toxin) or a general medical condition."[15]  Furthermore, "personality traits that define these disorders must also be distinguished from characteristics that emerge in response to specific

_____

[14] *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 685 (4th ed. 2000) ("Cluster B includes the Antisocial, Borderline, Histrionic, and Narcissistic Personality Disorders.").
[15] *Id.* at 686, 689.

situational stressors or more transient mental states (e.g., Mood or Anxiety Disorders, Substance Intoxication)."[16]  "When a person has a Substance-Related Disorder, it is important not to make a Personality Disorder diagnosis based solely on behaviors that are consequences of Substance Intoxication or Withdrawal or that are associated with activities in the service of sustaining a dependency (e.g., antisocial behavior)."[17]

As indicated in the foregoing discussion, Rounsevelle has never been definitively diagnosed with personality disorder, although her medical care providers have, with appropriate qualification, suggested the tentative possibility that a personality disorder could explain some of her symptoms.  Moreover, none of the medical evidence of record indicates that Rounsevelle's possible personality disorder cause her any quantifiable impairment or functional limitation.  The ALJ appropriately addresses the personality disorder references in the record, by both Dr. Matsunaga and Dr. Meeker, and recognizes the doctors' reports of Rounsevelle's meth abuse, untrustworthiness regarding her abuse, its effect on her emotional stability, and their resulting uncertainty about whether the problem was meth abuse or a personality disorder.  The Commissioner's failure to make any finding as to Rounsevelle's alleged personality disorder was therefore reasonable based on the totality of the evidence in the record.

## III.    Failure to Further Develop the Record

Rounsevelle contends the ALJ did not develop the record adequately because he did not order a consultative psychological evaluation.

Critical to the disability determination process "is the gathering and presentation of

_____

[16] *Id.* at 686.
[17] *Id.* at 688-689.

medical evidence.  The burden of demonstrating a disability lies with the claimant." *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001), *citing Bowen*, 482 U.S. at 146 n. 5.  Nevertheless, "the ALJ has a duty to assist in developing the record." *Id.* at 841, *quoting Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 589 (9th Cir.1998); 20 C.F.R. §§ 404.1512(d)-(f), 416.912(d)-(f)).  "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–460 (9th Cir. 2001), *citing Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  "One of the means available to an ALJ to supplement an inadequate medical record is to order a consultative examination, *i.e.,* 'a physical or mental examination or test purchased for [a claimant] at [the Administration's] request and expense.'" *Reed*, 270 F.3d at 841, *quoting* 20 C.F.R. §§ 404.1519, 416.919.

Rounsevelle argues that the ALJ failed adequately to develop the record in this case, taking the position that the medical records in this case were inadequate and insufficient, necessitating a consultative psychological evaluation because "the only psychological testing in this case was performed in 1996." (Tr. 542-559).  While the 1996 evaluations were Rounsevelle's most comprehensive, her position is otherwise unfounded.

Aside from the 1996 evaluations, the record contains hundreds of pages of material pertaining to Rounsevelle's mental health from her mental health providers, primarily from Dr. Meeker and her counselors, psychologists, and psychiatrists at CCMH, where she took part in individual and group counseling up to three times per week, from 2004 through 2009.  (Tr. 287-298, 299, 300-417, 418-441).  Due to the sheer number of mental health records, their regularity, and their detailed analysis, the record paints a fairly clear picture of Rounsevelle's evolving mental and emotional impairments and her progress as she began taking medication and

Page 37 - FINDINGS AND RECOMMENDATION

undergoing counseling.

Rounsevelle's CCMH records contain progress notes from every scheduled individual and group counseling session, including more detailed observational and analytical notes from many sessions (*e.g.*, Tr. 296, 297, 322, 327, 329, 331, 332, 334, 335-336, 337, 339, 340, 343, 344, 357, 359, 361, 362, 363, 365, 367, 408, 409, 416), reports of phone calls between Rounsevelle and her counselors, psychologists, and psychiatrists (*e.g.*, Tr. 336), informational notes (*e.g.*, Tr. 336, 337, 340-341), reports by Care Coordination (*e.g.*, Tr. 330, 336, 337, 339), drug test results (*e.g.*, Tr. 338), and any other form of communication reported by Rounsevelle's counselors.  The mental health records further contained psychiatric evaluations (*e.g.*, Tr. 310-313), detailed individual treatment plans (*e.g.*, Tr. 292-294, 300-302, 347-349, 375-377), diagnostic reviews (*e.g.*, Tr. 290-291, 308-309, 314-315, 354-355, 382-383, 391-392), clinical formulations (*e.g.*, Tr. 316), and alcohol and drug assessments (*e.g.*, Tr. 384-407).

An ALJ errs by not supplementing the record only if the evidence is ambiguous or the record is inadequate for proper evaluation of the evidence.  *Mayes*, 276 F.3d at 459-460, *citing Tonapetyan*, 242 F.3d at 1150.  Here, the record before the ALJ was neither ambiguous nor inadequate to permit proper evaluation of the evidence.  Therefore, the ALJ was not required to develop the record further and did not err by not doing so.

## IV.    RFC Assessment

Rounsevelle contends the ALJ erred in assessing her RFC because he discounted her credibility and the RFC did not contain sufficient limitations regarding her ability to reach and her social anxiety.

Before proceeding to the fourth step of the sequential evaluation process, the ALJ must assess the claimant's RFC.  The ALJ must "determine whether the claimant has the residual

Page 38 - FINDINGS AND RECOMMENDATION

functional capacity to perform the requirements of her past relevant work." (Tr. 140).[18]

The ALJ provided a thorough explanation detailing his rationale in determining Rounsevelle's RFC and limitations. (Tr. 143-149). The ALJ found that Rounsevelle's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 145). Due to the fact that none of Rounsevelle's "treating physicians opined about [her] residual functional capacity, other than to refuse to write to the Agency to say that [she] could not work," the ALJ had to "rely on the opinions of non-treating physicians in conjunction with signs, symptoms, laboratory findings noted by the treating physicians and the claimant's subjective complaints and allegations." (Tr. 145). The ALJ's subsequent detailed analysis of Rounsevelle's medical records (Tr. 145-149), supported his determination that, as to Rounsevelle's "degenerative disk disease, bilateral carpal tunnel syndrome and PTSD . . . the record supports the residual functional capacity." (Tr. 145).

Rounsevelle argues that, in posing the hypothetical questions to the vocational expert, the ALJ failed to set out all of Rounsevelle's limitations. Specifically, Rounsevelle argues that the ALJ erred when posing the hypothetical questions to the vocational expert because he failed to include limitations pertaining to Rounsevelle's ability to reach (due to her DDD of the cervical spine) and to interact with her coworkers and peers. Rounsevelle argues that, had these additional limitations been included in the hypothetical posed to the vocational expert, none of the three jobs proffered by the vocational expert (copy machine operator, document scanner or

_____

[18] *Citing* 20 C.F.R. 416.920(f).

preparer, and cafeteria helper) would have been suitable.

For the following reasons, I do not find Rounsevelle's argument that the ALJ erred when posing the hypothetical questions to the vocational expert persuasive, as to both Rounsevelle's ability to reach and her ability to interact with coworkers and peers.

###    A.    Claimant Credibility

Dr. Kehrli also determined that Rounsevelle's statements were only partially credible (Tr. 469), a reasonable conclusion that is well supported by evidence of record.  (Tr. 147-148, 316, 363, 427, 442-443).  In the physical summary completed on March 13, 2007, Dr. Jensen concurred with Dr. Kehrli's assessment, stating that "[t]he limited light RFC remains reasonable."  (Tr. 443).

Dr. Anderson, the psychologist who completed the mental summary on March 14, 2007 (Tr. 442), concurred with Dr. Kehrli's assessment that Rounsevelle had credibility concerns and felt incentivized to avoid any type of employment, reporting that "[m]uch of [Rounsevelle's] motive for getting on SSI is revealed in the chart notes from the mental health center, where she says that she'[d] like to work but does not want to pay child support."  (Tr. 442).  Dr. Anderson further reported that "[t]here are also credibility issues related to [Rounsevelle's] meth use/relapse and concern by at least one doctor that she is drug-seeking."  (Tr. 442).

After evaluating evidence in the record concerning Rounsevelle's lack of trustworthiness and incentives to avoid finding employment (Tr. 147-148), the ALJ opined that "[i]n light of the therapist's belief that work would help [Rounsevelle's] symptoms, [her] reluctance to try to work due to concerns about paying child support, losing insurance and fear of failure appears self-limiting rather than a functional limitation due to any of [her] impairments."  (Tr. 148).  The ALJ did not err in discounting Rounsevelle's credibility.

Page 40 - FINDINGS AND RECOMMENDATION

**B.      Reaching**

Rounsevelle first argues that the ALJ erred in posing hypothetical questions to the vocational expert that did not include a limitation for "reaching." (Pl.'s Opening Br., 8). Rounsevelle claims that she is limited to occasional overhead reaching due to her DDD of the cervical spine and that this limitation should have been reflected in the hypothetical questions. (Pl.'s Opening Br., 8). In support, Rounsevelle cites the physical RFCA not from this claim, but from her prior DIB and SSI applications that were denied without appeal. (Tr. 523-530). This prior physical RFCA, performed by Mary Ann Westfall, M.D., on August 18, 2005, included a limitation to occasional overhead reaching. (Tr. 526). Rounsevelle explains that "[t]he import of this is that the three jobs identified as suitable by the V[ocational] E[xpert] all require *Frequent reaching*." (Pl.'s Opening Br., 8) (emphasis added).

Rounsevelle's argument relies solely on the finding from the prior physical RFCA. (Tr. 523-530). The 2006 physical RFCA pertaining to the application for SSI currently before the court (Tr. 462-469), found that Rounsevelle was limited to frequent overhead reaching, not the more restrictive occasional overhead reaching limitation found in the prior physical RFCA. (Tr. 465, 526). Rounsevelle does not dispute or address the validity of the findings and conclusions of the 2006 physical RFCA.

Martin Kehrli, M.D., the medical consultant who performed the 2006 physical RFCA, noted that Rounsevelle claimed she was doing better physically in August of 2006, just two months before the physical RFCA was completed on October 18, 2006. (Tr. 469). Dr. Kehrli's was referencing Rounsevelle's August 14, 2006, individual therapy session with Ms. Breck, who noted that after getting "found out" for using meth again, Rounsevelle "gained about 30 lbs and

Page 41 - FINDINGS AND RECOMMENDATION

report[ed] that she fe[]l[t] better both physically and emotionally." (Tr. 416). The ALJ also noted that, after his analysis of Rounsevelle's medical records related to her DDD of the cervical spine, the record "indicates that [Rounsevelle] perceive[ed] her upper back and neck pain as more severe than indicated by the medical findings." (Tr. 145). Because the 2006 physical RFCA was based on the most current medical evidence, and because each of the three jobs could be performed by a person subject to the 2006 physical RFCA, the ALJ's hypothetical was not erroneous.

### C.     Social Anxiety

At the April 13, 2009, hearing, the hypothetical posed by the ALJ to the vocational expert contained "a social impairment of a moderate nature," where "moderate limitation" was defined as a limitation "which would preclude work for which public interaction is a primary purpose of part of her job." (Tr. 126). Rounsevelle argues the ALJ erred by posing hypothetical questions to the vocational expert that did not contain sufficient limitations for interaction with others, claiming her impairments necessitate limited interaction with not only the general public, but also coworkers and peers. To support her claim, Rounsevelle cites the mental RFCA performed by Peter LeBray, Ph.D., on October 19, 2006, which states that Rounsevelle is "limited to interactions that require minimal contact [with the] general public as well as limited contact [with] peers/coworkers." (Tr. 460). The mental RFCA further stated that Rounsevelle would be more "[r]esponsive to supportive lay supervision (not [an] overly harsh, critical style)." (Tr. 460).

While Dr. LeBray does state in the mental RFCA that Rounsevelle's contact with her coworkers and peers should be limited (as opposed to just minimal with the general public), in the same mental RFCA, he determined that Rounsevelle's "ability to work in coordination with

Page 42 - FINDINGS AND RECOMMENDATION

or proximity to others without being distracted by them [is] not significantly limited" (Tr. 458),

the lowest degree of limitation.  Furthermore, while Dr. LeBray determined that Rounsevelle's

"ability to interact appropriately with the general public [was] moderately limited," he then

determined that her ability to "accept instructions and respond appropriately to criticism from

supervisors," "get along with coworkers or peers without distracting them or exhibiting

behavioral extremes," "maintain socially appropriate behavior and to adhere to basic standards of

neatness and cleanliness," and "respond appropriately to changes in the work setting" were "not

significantly limited."  (Tr. 459).  Lastly, in the PRT, Dr. LeBray noted that in September of

2005, when her physically and emotionally abusive ex-boyfriend died, Rounsevelle "state[d] it

ha[d] been easier to leave her home and be around others."  (Tr. 456).

The ALJ agreed with Dr. LeBray's analysis and conclusion as to Rounsevelle's mental

and emotional condition as detailed in the mental RFCA.  (Tr. 142).  While Rounsevelle

highlights Dr. LeBray's assessment that she should be limited to interactions requiring limited

contact with coworkers and peers, she does not address the multitude of contradicting evidence

in Dr. LeBray's mental RFCA.  Furthermore, the ALJ found that Rounsevelle's "mental health

has continued to improve since Dr. LeBray's opinion" (Tr. 142), which took place in October

2006, two years and eight months before the ALJ's June 19, 2009, decision.  The ALJ did not err

in the degree of social anxiety he incorporated into the hypothetical posed to the vocational

expert.

## V.    Vocational Evidence

Rounsevelle contends the ALJ erred at the fifth step of the sequential evaluation process

by relying on a vocational hypothetical that did not accurately reflect her RFC.  She also

contends the ALJ erred when he failed to question the vocational expert about whether her

Page 43 - FINDINGS AND RECOMMENDATION

testimony conflicted with and was consistent with the DOT.  She lastly contends the vocational

expert's testimony conflicted with the DOT.

"If a claimant shows that . . . she cannot return to . . . her previous job, the burden of

proof shifts to the Secretary to show that the claimant can do other kinds of work."  *Embrey v.

Bowen*, 849 F.2d 418, 422 (9th Cir. 1988), *citing Gamer v. Sec'y of Health & Human Servs.*, 815

F.2d 1275, 1278 (9th Cir. 1987).  At the fifth step of the evaluation process, the ALJ "must use a

vocational expert to meet that burden.  Hypothetical questions posed to the vocational expert

must set out *all* the limitations and restrictions of the particular claimant, including, for example,

pain and an inability to lift certain weights."  *Id.*, *citing Gamer*, 815 F.2d at 1280 (emphasis

original).  "If the assumptions in the hypothetical are not supported by the record, the opinion of

the vocational expert . . . has no evidentiary value."  *Gallant*, 753 F.2d at 1456.  The best way to

avoid this problem and "insure the validity of the hypothetical question posed to the vocational

expert is to base it upon evidence appearing in the record, whether it is disputed or not."  *Id.*

Here, the ALJ posed the hypothetical to the vocational expert as follows:

Assume that I find that the claimant could perform a limited range of light work
with the following limitation.  First of all in her ability to bimanually manipulate
that would be limited to frequent.  Secondly, a social impairment of a moderate
nature and I am going to define moderate limitation as one which would preclude
work for which public interaction is a primary purpose of part of her job
requirement and additionally a moderate limitation in ability to concentrate and
I'm going to define moderate in this case as claimant would not perform work
which would require her to perform skilled work activity or work that would
require continuous attention for long periods of time without at least brief
moments of a break.

(Tr. 126).  The ALJ's hypothetical was consistent with his assessment of Rounsevelle's

RFC and limitations.  As with the claimant discussed in the hypothetical, the ALJ found

that Rounsevelle had "the residual functional capacity to perform light work," and was

Page 44 - FINDINGS AND RECOMMENDATION

further restricted to unskilled work[19] that precluded public interaction as a primary

requirement and required no more than frequent bilateral manipulation.  (Tr. 143).

SSR 00-4p states that "[w]hen a [vocational expert] . . . provides evidence about the

requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any

possible conflict between that [vocational expert] . . . evidence and information provided in the

DOT."[20]  "SSR 00–4p further provides that the adjudicator '*will* ask' the vocational expert 'if the

evidence he or she has provided' is consistent with the *Dictionary of Occupational Titles* and

obtain a reasonable explanation for any apparent conflict."  *Massachi v. Astrue*, 486 F.3d 1149,

1152-1153 (9th Cir. 2007), *quoting* SSR 00-4p, at *4 (emphasis original).

Regarding Rounsevelle's employment possibilities based on the RFC, I agree with

Rounsevelle that the ALJ erred when he failed to ask the vocational expert if (1) there were any

conflicts between her testimony and the DOT and (2) her testimony was consistent with the

DOT.

In *Ludwig v. Astrue*, the Ninth Circuit explained how administrative adjudications are

subject to the harmless error rule and how a court determines if an error is harmless or

prejudicial:

> *Shinseki v. Sanders* establishes that administrative adjudications are subject to the
> same harmless error rule as generally applies to civil cases.  Reversal on account

---

[19] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."  20 C.F.R. 416.968(a).

[20] SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000).

of error is not automatic, but requires a determination of prejudice.  Determination of prejudice requires "case-specific application of judgment, based upon examination of the record," not "mandatory presumptions and rigid rules."  The burden is on the party claiming error to demonstrate not only the error, but also that it affected his "substantial rights," which is to say, not merely his procedural rights.[21]  Among the case-specific factors an appellate court must consider are "an estimation of the likelihood that the result would have been different," as well as the impact of the error on the public perception of such proceedings.

681 F.3d 1047, 1054 (9th Cir. 2012), *quoting Shinseki v. Sanders*, 556 U.S. 396, 407-409,

411 (2009).

[While] the burden to show prejudice [is] on the party claiming error by the administrative agency, the reviewing court can determine from the "circumstances of the case" that further administrative review is needed to determine whether there was prejudice from the error.  Mere probability is not enough.  But where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency "can decide whether re-consideration is necessary."  By contrast, where harmlessness is clear and not a "borderline question," remand for reconsideration is not appropriate.

*McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011), *quoting Sanders*, 556 U.S. at 410,

414.

The Ninth Circuit explained in *Massachi* that the procedural error at issue here would be "harmless, were there no conflict, or if the vocational expert [provided] sufficient support for her conclusion so as to justify any potential conflicts."  486 F.3d at 1154 n. 19.

Rounsevelle argues that there is an "apparent conflict" between the vocational expert's testimony as to Rounsevelle's employment options and the DOT.  Specifically, "there is a conflict, in that the ALJ's hypothetical contained a limitation on public contact, and the

---

[21] "The harmless error rule, as codified, requires us to 'give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.'"  *Ludwig v. Astrue*, 681 F.3d 1047, 1054 n. 22 (9th Cir. 2012), *quoting* 28 U.S.C. § 2111.

[vocational expert] proffered a job [cafeteria helper] which would involve such contact." (Pl.'s Opening Br., 9). At the hearing, the hypothetical given to the vocational expert "preclude[d] work for which public interaction is a primary purpose or part of her job requirement." (Tr. 126). While Rounsevelle correctly states that a cafeteria helper job could include some amount of public contact, she has not shown or even argued that public contact would be a "primary purpose or part of her job," the explicit limitation imposed by the ALJ in Rounsevelle's RFC, which Rounsevelle has not contested. (Tr. 126, 143).

Furthermore, even if Rounsevelle had argued that public contact was a primary requirement of the cafeteria helper job, it would likely have been unconvincing. The DOT states that the cafeteria helper job, officially titled "cafeteria attendant," requires "Talking" and "Hearing" only "[o]ccasionally – Exists up to 1/3 of the time."[22] It is reasonable to conclude that, given Rounsevelle's public contact limitations in the ALJ's RFC determination (Tr. 126, 143), there is no "apparent conflict" between these limitations and the cafeteria helper job proffered by the vocational expert (Tr. 126), as one can reasonably determine that "up to 1/3 of the time" does not represent a "primary purpose or part," and Rounsevelle has failed to show otherwise.

Moreover, even had Rounsevelle successfully shown that there was conflict between the ALJ's hypothetical and the vocational expert's proffered job of cafeteria helper, this conflict would not have been sufficient to alter the ALJ's finding and ultimate decision. A person is considered disabled under the Social Security Act:

[O]nly if his physical or mental impairment or impairments are of such severity

---

[22] DOT § 311.677-010, *available at* 1991 WL 672694 (4th ed. 1991).

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C.A. § 423(d)(2)(A).  The other two jobs proffered by the vocational expert (copy machine operator[23] and document scanner or preparer[24]) combined to have 3,067,240 jobs in the national economy and 39,950 jobs in the Oregon economy.

In *Barker v. Sec'y of Health and Human Servs.*, after finding that the 1,266 jobs existing in the national and local economy in its case constituted a "significant number," the Ninth Circuit examined more generally what number of jobs needed to exist in the national and local economy to satisfy the requirement in the fifth step of the evaluation process that "work exists in significant numbers":[25]

> This Circuit has never clearly established the minimum number of jobs necessary to constitute a "significant number."  In *Martinez v. Heckler*, 807 F.2d 771, 775 (9th Cir. 1986), the court upheld the ALJ's finding that 3,750 to 4,250 jobs were a significant number.  The Sixth Circuit has found that 1,350 jobs in the local economy constituted a significant number.[26]  The Eighth Circuit has held that as few as 500 jobs were a significant number.[27]  Decisions by district courts within this circuit are also consistent with the Secretary's finding in this case.[28]

---

[23] Officially titled "Photocopying-Machine Operator."  DOT § 207.685-014, *available at* 1991 WL 671745 (4th ed. 1991).

[24] Officially titled "Document Preparer, Microfilming."  DOT § 249.587-018, *available at* 1991 WL 672349 (4th ed. 1991).

[25] 20 C.F.R. § 416.960(c); 42 U.S.C. § 423(d)(2)(A).

[26] *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).

[27] *See Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988).

[28] "*See, e.g.*, *Salazar v. Califano*, Unemp. Ins. Rep. (CCH, para. 15,835) *1479 (E.D. Cal. 1978) (600 jobs is significant number); *Uravitch v. Heckler*, CIV-84-1619-PHX-PGR, slip op. (D. Az. May 2, 1986) (even though 60-70% of 500-600 relevant positions required experience plaintiff

Page 48 - FINDINGS AND RECOMMENDATION

882 F.2d 1474, 1478-1479 (9th Cir. 1989).

Here, the number of jobs proffered by the vocational expert, excluding cafeteria helper, available in the Oregon economy reaches nearly 40,000, approximately ten times or more than the number of jobs found sufficient in the cases surveyed in *Barker*. Even if cafeteria helper is disregarded, the number of copy machine operator and document scanner or preparer jobs existing in the Oregon economy alone would far surpass the level necessary to be considered in "significant numbers."

In *Meanel v. Apfel*, after finding that "the ALJ properly concluded that there was a significant number of surveillance systems monitor jobs," when "there were between 1,000 and 1,500 . . . in the local area," the Ninth Circuit held that addressing plaintiff's argument concerning the validity of the other proffered job, "fund raiser II," was unnecessary. 172 F.3d 1111, 1115 (9th Cir. 1999). "In [*Barker*], we held that a comparable number, 1,266, was a significant number. Thus, we need not address Meanel's arguments regarding the additional occupation of fund raiser II." *Id.* Under *Meanel*, because 39,950 jobs clearly satisfies the "significant number" requirement of the fifth step of the evaluation process, even if the cafeteria helper job is excluded from consideration, the ALJ did not err by concluding that Rounsevelle could perform jobs existing in significant numbers in the national economy.

In consequence, because the vocational expert identified a significant number of jobs, even if the identification of cafeteria helper is disregarded, the ALJ's finding that Rounsevelle can perform work that exists in significant numbers in the national economy is supported by

---

did not have, remaining positions constitute significant number)." *Barker*, 882 F.2d at 1479.

Page 49 - FINDINGS AND RECOMMENDATION

substantial evidence.

## VI.    Post-Decision Evidence

Rounsevelle contends that the Appeals Council erred by not considering additional evidence submitted after the ALJ's decision.

Between the ALJ's decision of June 19, 2009, and the Appeals Council's request for review denial of September 13, 2012, Rounsevelle submitted additional medical evidence to the Appeals Council spanning from July 15, 2009, to August 19, 2011 (Tr. 5-85), taking the position that the later-filed records indicated worsening of her impairments during the period of time between the ALJ's and the Appeals Council's denials.  (Pl.'s Opening Br., 5).  In its denial, the Appeals Council stated that Rounsevelle did "not provide a basis for changing the Administrative Law Judge's decision. . . . [The] new information [submitted by Rounsevelle was] about a later time.  Therefore, it [did] not affect the decision about whether [she was] disabled beginning on or before June 19, 2009."  (Tr. 2).  The Appeals Council then explained that if Rounsevelle wanted the Commissioner to consider whether she was "disabled after June 19, 2009, [she] need[ed] to apply again."  (Tr. 2).

In *Brewes v. Comm'r of Soc. Sec. Admin.*, the Ninth Circuit observed that:

[A]lthough the Council declined to review the ALJ's decision [in *Ramirez v. Shalala*], "it reached this ruling after considering the case on the merits; examining the entire record, including the additional material; and concluding that the ALJ's decision was proper and that the additional material failed to 'provide a basis for changing the hearing decision.'"

682 F.3d 1157, 1162 (9th Cir. 2012), *quoting Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993).

The rule for determining whether or not evidence submitted after the ALJ's decision should be considered is codified at 20 C.F.R. § 404.970(b), which states:

Page 50 - FINDINGS AND RECOMMENDATION

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence **only where it relates to the period on or before the date of the administrative law judge hearing decision**.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted **if it relates to the period on or before the date of the administrative law judge hearing decision**.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

(emphasis added).

Rounsevelle correctly notes that during the period of time covered by the late-filed records, she developed DDD of the lumbar spine (Tr. 78-79), and additionally argues that the records suggest increased mental and emotional impairments over that period.  (Pl.'s Opening Br., 5).  As for Rounsevelle's DDD of the lumbar spine, the late-filed records indicate that this is a recently developed condition for which there is no evidence prior to date.  As such, the late-filed evidence of Rounsevelle's DDD of the lumbar spine is not evidence that "relates to the period on or before the date of the administrative law judge hearing decision."[29]  In consequence, under 20 C.F.R. § 404.970(b), the Appeals Council was correct in not considering the additional evidence submitted pertaining to the lumbar condition.

As to Rounsevelle's purportedly increased mental and emotional impairments, in fact the late-filed records do not in any sense support Rounsevelle's position that her impairments have increased.  To the contrary, the new references to "interference" in Rounsevelle's life appear chiefly to relate back to as far as 2001, when she last worked.  Indeed, the late-filed records suggest that Rounsevelle has shown significant improvement rather than deterioration in her mental and emotional condition since June 19, 2009, including graduating from MH group

---

[29] 20 C.F.R. § 404.970(b).

therapy.  (Tr. 48).  Under the circumstances, the Appeals Council did not err by failing to consider the additional evidence submitted pertaining to Rounsevelle's mental and emotional impairments.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision in connection with Rounsevelle's application for SSI be affirmed.  A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 26th day of June, 2014

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge